v. Vicor, 2016-22-88. Before you begin, Mr. Ryan, it's not relevant to the issues that you're arguing, but have these patents expired? They all go back to January 1997. They have not expired yet. I think they run through next year. Because of patent term adjustment? I believe so. On one of them, but not on two of them? I think the 290 has about a half a year of adjustment? Right. I've been corrected. The provisional runs from 1997. The original application runs from 1998, so they have not expired as a consequence. I'm going to start with the secondary consideration issue because Judge Chen asked earlier whether there's an inconsistency there. I want to start out with the nexus inquiry because, as this Court held in WBIP, there is a presumption of nexus where the patentee shows that the asserted objective evidence is tied to a specific product, and that product is the invention disclosed and claimed in the patent. My understanding of WBIP is consistent with DEMICO, which is when the claimed invention is the product being commercialized and when the commercial product is the claimed invention, i.e. coextensiveness. So to the extent your claim is identical to the product, then you get the presumption of nexus. Now, where did you make that argument below? Well, we did argue below that the products that are at issue in these claims are the commercially successful products in the marketplace. And the Board looked at that and found that they do indeed map very closely to the patent claims at issue here. But there wasn't a finding by the Board that I could see where they said, yes, the claimed invention is coextensive to the products. In fact, you know, I wonder how it could be when we've got so many different claims flying around here with different permutations of the basic IBA architecture. The question always is whether the claims are reasonably commensurate with the commercially successful products and other secondary consideration evidence. Are we talking about to gain the presumption of nexus? Well, again, that is the basic nexus question. As far as to gain the presumption of nexus, they have to be, it has to be as you point out. Reasonably commensurate, that's one element of the inquiry. Another element is, is it the merits of the claimed invention that are driving the secondary consideration indicia? Right. And here the answer is... And now we're left with the switching regulators. And to what extent are the switching regulators driving all the commercial sales, driving all the craze and copying, et cetera, versus the more basic fundamental intermediate bus architecture, which we now know was fully well known in the prior art? Your Honor, I respectfully submit that that's an oversimplification. The architecture that's the subject of these claims is very specific. Let's take the 290. It's a non-regulating isolation to stage with synchronous rectification, as you point out. In some claims there are other efficiency enhancing features, such as in the 702 where there's short transitions, or in the 021 where there's substantially uninterrupted power flow. And not only that, but these claims at issue all involve switching regulators. And it's the combination of all the claim elements that is responsible for the benefits in the marketplace. Those commercially successful products needed that combination of features. That's the core architecture. The core architecture is the combination of an isolation stage that's very efficient and is non-regulating, and switching regulators that are needed. And so it's the combination. And what the court found in WBIP is that the evidence doesn't have to be exclusively tied to claim elements that are not in the prior art, or in this case, not in anticipated claims. Requiring patentees to prove that objective evidence is tied to a specific claim element and only that claim element runs counter to the statutory instruction that the obviousness analysis involves determining whether the claimed invention as a whole would have been obvious. You're not suggesting at any time that there's a new combination of old elements. You automatically enjoy nexus because all the elements combined in that particular way happens to be new. No, I'm not suggesting that at all. There's something in between going on here. You need to look at the claim elements and see how closely intertwined they are, how closely they map to the commercially successful products. And that's what the board did in this case, in the 290 case. By the way, it also did that in the 021 when it came back on rehearing and found that there was a nexus because those claims closely map. Now, that's not the end of the matter, as Your Honor suggested. There is the question then as to whether the commercial success derives from that claim combination or whether it derives from something else. That something else could be advertising. That something else might be the prior art. But here the benefits do not derive from the prior art, not from Steigerwald for certain. Steigerwald is a very specific PULST application that has a very different objective. And the efficiency benefits and the other space savings benefits are not traceable to Steigerwald. What the board found is that the benefits here are directly traceable to the novel combination. And that's what the court found in WBIP. You don't just have to look at – if the dependent claim feature was make it red, then I would agree with you that the benefits are not traceable to that dependent feature. Can I ask you what evidence did you have that said we have commercial success, we have other forms of non-art indicia that are stronger for some of these claims than, for example, the anticipated 190? Well, first of all, that was not – it wasn't necessary to make that argument below. But it may have turned out to be necessary. Well, we're talking about reexaminations here. And in the 290, we dealt with the claims of the 290. In the 021, we dealt with the claims of the 021. Let me – I mean, I think you understand the point. There's a very simple, almost syllogism – I don't know if syllogism – anyway, simple typological argument. And I don't know which part of this is wrong. You made a set of secondary considerations arguments equally applicable to all of the claims and all of these patents. Some of them are now adjudicated to be in the prior art, so you don't have anything left. Your Honor, we did not make that broad-based argument that FICOR suggested we made. What we pointed out in these reexaminations is that the secondary considerations were traceable to the trial claims, the claims in the 190 trial, such as Claim 2, which the Board found – I thought there was a claim chart in one of these cases where you lined up your patent claim against the 190 patent claim, and then it turned out – whoops – that 190 patent claim turned out to be anticipated. The Board did that in its decision. That claim was Claim 2 of the 190. That claim has not been found to be anticipated. That claim has switching regulators. The Board found that that claim maps very closely to the 290 claims. The Board did that based on the evidence and arguments that were made. We never mapped the 290 claims to any of the anticipated claims, and we didn't try a case involving those claims that were found to be anticipated. The trial claims were narrower. We selected claims that we thought were appropriate at trial, and all the secondary consideration evidence was tied to the trial claims. When you say the trial claims, what are we talking about here? Are we talking about the trial that led to the Federal Circuit opinion in 2013? Yes, that's correct. And those claims, the claims that were asserted involved certain claims, not all, from the 190, certain claims from the 702, which are, in fact, at issue in the 702 reexamination. And when it came to the secondary consideration evidence, I don't remember anything being highlighted in particular in the opinion other than commentary about the two-stage architecture being a basis for all the commercial success you enjoyed. The arguments that were made both to Judge Gilstrap and to the Court of Appeals took the secondary consideration evidence and mapped it to the claims that were tried in that case, said that they were closely intertwined, pointed out that the key features were a very efficient non-regulating isolation stage called a bus converter that had efficiency-enhancing features, such as short transitions, such as, in the case of the 021, substantially uninterrupted power flow. We also pointed out that they all have, every one of the successful systems has switching regulators. So we did link the secondary consideration evidence to all the claim limitations, including claim limitations that are absent from the claims that were found anticipated. Again, those claims that were found anticipated were not in the trial. And we did not ever tie the secondary consideration evidence to those claims. VICOIR is basically taking undue liberty with a statement about the architecture. The architecture that was described was not just any old two-stage architecture. It was a very specific architecture that involved an unregulated bus converter as that term became known in the industry. As that term became known, that bus converter had a synchronous rectification and it had efficiency-enhancing features, such as short transitions, such as substantially uninterrupted power flow. And it also- Mr. Ryan, do you want to get to any of the obviousness-specific rejections before you sit down? Yes. The anticipation rejection, I think, that they made was dead wrong. They originally based their anticipation argument on a sentence or two in Steigerwald, which has nothing to do with the power flow through the secondary winding circuit. And the claims here require substantially uninterrupted power flow through the secondary winding circuit, among other things. So the board and the examiner just missed that point. And on our petition for rehearing, we pointed that out yet again. And they finally addressed the issue of why or how there could be substantially uninterrupted power flow in the secondary winding circuit. And they pointed to average current. But even VIPOR doesn't try to defend their position in this appeal because it's dead wrong. And so the independent claims need to be remanded because the board made the wrong decision. Now, on the dependent claims that are at issue here, one of them involves switching regulators. And the secondary consideration evidence does tightly map to the entire claim, including the switching regulators. I will reserve for my rebuttal the point that the board actually, in this reexamination, applied the wrong rationale with respect to secondary considerations, which differentiates this case. That doesn't sound like rebuttal. Well, I'd love to go into it. I'm running short of time. The reason is that in that. Time management is important. Right. In this specific reexamination, the board was confused between resistance, which leads to inefficiency or power dissipation, and inductance, which would frustrate the whole objective of providing power quickly when it's needed. That's the basis for combining the Pressman with Stargill. Right. And so the board was confused in this one between induction and resistance. And when we pointed that out, because that was the basis of their decision, that, OK, you can add resistance, so you can also add more resistance, you can add an inductor. But they're two different animals, and that's how they got confused. And that was also true in the final board decision on the petition for rehearing. They continued to be confused, and that's why they reached the wrong result. Thank you. We will save your two and a half minutes. Mr. Smith. Thank you, Your Honors. I'd like to start with the issue of the substantially uninterrupted power flow. Mr. Ryan just said that the claim requires substantially uninterrupted power flow through the primary and secondary winding circuits, and that's not quite the claim language. The claim language is, in Claim 1, a control circuit which controls the duty cycle of the primary winding circuit, the duty cycle causing substantially uninterrupted flow of power through the primary and secondary winding circuits during normal operation. And there's a key, I think, claim construction issue here brewing. And that issue is whether or not this language actually requires these power converters to be in operation, hooked up and supplying power to something, or whether this is really about the design of the circuit. The language, substantially uninterrupted flow of power, I think, in the case, if we were talking about it delivering power to something that's using it, doesn't really make any sense. Because nobody would ever want a power supply system as these are, where the power flow is interrupted, and your computer is blinking on and off or something like that. It makes a lot more sense when you're talking about the design of the converter itself and how it would operate in normal operation. And the way we can conceptualize this, I think, is sort of as a delivery system, if you imagine, for water, which can be analogized to power. At the end of the line, where the customer is using the power, where you're plugging in to the power supply, you want to be able to just sort of turn on a faucet whenever you want to and get power out as you will. But in the actual facilitation of the system, in Steigerwald and in the O2-1 patent, we've got what are essentially people filling up buckets of power and putting them on a conveyor belt. These are the transistors that are switching and driving the transformer. Every time those transistors switch, we get a bucket of water. Imagine you put that on a conveyor belt. What the claims require here is that there be essentially no spacing between those buckets of water. So the buckets of water go down the line, then they get dumped into a tank. At the bottom of the tank, there's a faucet. So the person who is using that water eventually just is able to use it as well if the tank is big enough and designed in the proper way. But you can also separate those buckets of water. In this case, not drive the transformer continuously, but have spacing in there where you're not putting power into the system. It's a very legitimate design philosophy. Now, when those buckets arrive at the end to the customer, they still get dumped into the tank. And what the customer, the user of the system, experiences is uninterrupted power flow as a user. But in the primary and secondary winding circuits, the buckets have spacing between them. Why would you do that? Because there's some overhead in the circuit you need to take care of, and that spacing gives you time to do it. And people design circuits that way. That's what this means. And the reason that's important is all of the argument about the current that the loads are using is really irrelevant. What's relevant is what the board actually found based on Steigerwald, that the transistors driving the transformer are operating with a complementary 50% duty cycle, which means when one transistor is off, the other is on. There's always power being input, where in our analogy, the buckets have absolutely no spacing between them at all in the Steigerwald system. And it works the same way in the O2-1 patent. That's what we're really talking about. And that's why we believe that regardless of what one finds with the rehearing decision and the board's finding regarding the I0 current, it just doesn't matter because the claim doesn't require anybody to analyze what the power flow that is experienced by the user actually is. I want to address also some of the questions that came up. Can you just talk a little bit about the average current discussion in the rehearing decision? I can, absolutely. What should we do about it? Regardless of how it got there, who triggered it, what do we do with it now? I think you don't need to decide anything about it because I think the board's finding regarding Steigerwald, which I just went through, the 50% duty cycle, the fact that Steigerwald teaches effectively that the input of the converter is always connected to the output meets the claim language. In other words, as a matter of law, the finding about the current that is actually flowing through in specific applications is simply not relevant to whether the claim language is invalid over the Steigerwald reference. So just stay focused on Figure 1 of the 090 and don't worry about this discussion of Figure 2 and the 539? I think you absolutely can do that, Your Honor. Yes, I don't think the claim language requires what Syncor is arguing it requires. It only requires something about the design of the circuit, not the way it is used in Steigerwald's application. What about Figures 8 and 9 and Figure 10? Figures 8, 9, and 10, the argument that Syncor brought up about why there would be substantial interruption were brought up for the first time in the rehearing request to the board. So to the extent that the board addressed or did not address, I think the board was free to ignore that because the argument simply hadn't been made before. The argument that Syncor had made before was this sort of load argument that I've been talking about where the devices that are plugged into the power supply system may or may not be demanding power at any point in time. And this is sort of a critical distinction, I think, that runs through all of these cases that deal with Steigerwald. We talk sometimes a little bit loosely about pulsed outputs or non-pulsed outputs. The outputs are essentially all the same, although they are at different voltage levels. What matters is the device you plug into it and what that device is doing. At the pulsed output, the device is simply going on and off. So it demands power, and then it doesn't demand power. Then it demands it, then it doesn't demand it. At the other outputs, you've got more traditional DC devices like computer equipment that might demand it intermittently sometimes, but they might also demand a steady flow. It's just that Steigerwald expects that somebody is going to plug something pulsed into that V1 output. But it's not like the Steigerwald system is delivering pulses down the line or anything like that. It's responding to what the load wants. The system is designed to supply whatever power supply current is necessary to the loads. And I think that's an important distinction for the discussion that we've had here today. So I think that ultimately the discussion about I0 that the board added into the re-hearing decision, and certainly concede that that's a new finding in the re-hearing decision, is just not relevant to the overall decision that the board made, which can be fully supported by the finding that was present since the re-examination request argued in every paper all the way through and in the board's first and second hearings about Steigerwald, the nature of the duty cycle, and the fact that the input is always connected to the output. I do think that the board's finding, and this is going beyond your assumption regardless of who argued it first and the circumstances under which they argued it, I do think the board's finding was predicated on Syncor's assumption that you see brought up on appendix pages 127 to 128 that figure 2 represents the operation of Steigerwald. If you read Syncor's argument there, they're not making a careful distinction by saying, yes, figure 2 is prior art. We're just using it as an example of pulsed loads. They're actually glossing over the fact that figure 2 is represented as prior art and saying that that represents the operation of Steigerwald. I think the board was free in that circumstance to adopt that assumption, arguendo as it were, and then reason from there to find consequences. I think it's perfectly permissible for the board to adopt a party-initiated hypothetical and then see what happens from there. That's a circumstance, I think, that the board did do that. But the board's primary finding was the 15% duty cycle, and its opinion can be sustained based on that. I do also want to address some of the arguments that came up during the colloquy regarding secondary considerations. Can you be very specific about what I took to be at least the very simple version of your main point about secondary considerations, which is Syncor presented secondary considerations, evidence and argument, which Syncor said was equally applicable to this universe of patent claims, including ones that we now know simply describe the prior art and didn't make any distinctions so that one has to draw the inference that whatever the success was and the praise, etc., was due to the prior art. So where did they say that in a way that nails that down, if I've just summarized things correctly? That is correct. There are a couple of nuances that I would add, and then I'll answer the question about where they said that. So throughout all of the Syncor cases, and I'm including what we're calling the Syncor 1 trial in East Texas that eventually went up to this court in 2013, the reexaminations, up until the point where this court issued its 2014 ruling, Syncor's position was that all of the claims in each of its patents were entitled to the full benefit of the secondary considerations evidence. And that's been modified somewhat, the 2015 opinion coming out at a time where it wasn't really possible to brief it to the board except on rehearing. So now we see a modification to that. I think there are a couple of nuances to that. One is that to the extent Syncor ever did emphasize features, what they really emphasized was the separation of stages. And you can still see that in their briefing now, but you can see it in the claim chart, for example, that they showed to the jury in East Texas, which I think is on page 30 of our brief, or maybe, sorry, page 30 in the prior case, where they grouped the 702.021.190 patent and say, this is a non-regulating, isolating converter connected to multiple outputs that are regulating. That sort of argument ran all the way through that trial. Where it really gets nailed down, I think, is in the briefing to the board in the prior case. And Mr. Ryan said, hey, look, nobody ever challenged us on this before. Nobody ever asked us to parse out one claim for another and say which one is really driving the secondary considerations evidence, and I don't think that's accurate. If you read the briefing that we quote from the 290 patent case, so the appeal that you just heard, where Syncor argues that the 290 patent is entitled to the benefit of the secondary considerations that attach to the 190 patent before some of its claims were anticipated, and if you look at the board's finding in that regard, Syncor is really responding to Vicor, pushing it to say, hey, which of these claims are responsible for which parts of the success? Because you've got over six patents, 185 claims. Some of them are mutually inconsistent. For example, from the 2013 decision, this court decided the validity over a 103 challenge of Claim 9 of the 034 patent. Claim 9 of the 034 patent requires a semi-regulating front end, which seems to me to be mutually inconsistent and mutually exclusive of an unregulated front end. And I think it is accurate to say that that opinion talked about the separation of the power architecture into stages and focused on that. So we pushed Syncor on that, and Syncor's response to that was, look, nobody, not even the federal circuit, has ever tried to parse these things. It is always attached to all of the claims in all of the cases. And that's the briefing that we quote from the 290 patent. And I think that's where we really nailed down where Syncor is tying specifically all of its claims together and all of its claims to a common set of features that's really based in the division of stages that's common through all of the claims in all of the patents. Does that answer the question? So far, yes. Thanks. Thank you. Do you want to continue? You have a minute plus. Thank you very much. I want to make one last comment in response to something Mr. Ryan said on the presumption of nexus and the efficiency-enhancing features. I assume these are efficiency-enhancing features in the stage that involves synchronous rectification. And I just want to point out that even among the three patents we have here today, those efficiency-enhancing features allegedly are all different parts, sorry, are different in each of the claims that we have in each of the patents today. So, for example, you'll find the 702 patent, which was the subject of the first case, has a relatively more narrow description of the synchronous rectification. Transformer can't be driven into saturation. It requires short transitions. All of these things, by the way, are found in the prior art. That's why we're not arguing about them today as potential distinctions over the prior art. But the 290 patent is broader than that. It's missing some of those features. The 021 patent we have today has this substantially uninterrupted flow of power, which isn't in the other two. I do have one last quick question. Hopefully you can give me a quick answer. In this particular case, the board found, yes, there's a motivation to add a switching regulator to Steigerwald because of what we said in the 2015 Federal Circuit opinion. It appeared to me in the initial decision that there was some confusion on the board's part between inductors and synchronous rectifiers and what they include, which do not include inductors. Then on the rehearing decision, the board came back and said something about how Pressman talks about higher efficiency. Steigerwald talks about don't put an inductor in my system. Then the board appeared to just go with Pressman there. What am I supposed to understand the board's actual finding to be? Here's what I understood from that, that the motivation was the efficiency from Pressman. There was testimony, which I think they referred to in the rehearing decision, that synchronous rectification would actually be less efficient, which I think factually is just wrong, but there was that testimony there. Then they pointed at the Federal Circuit's decision from 2015 to say synchronous rectification is actually a part of Steigerwald's embodiment, meaning despite this argument that Syncor has put forward that it would be less efficient. Do you agree that the board's finding here on this particular score directly conflicts with the board's finding in the prior appeal with the 290 patent and the combination of Pressman switching regulator to Steigerwald? Adding a switching regulator. The same answer I gave last time. I think there are certain slight differences in the record, but I think it's generally difficult to reconcile. Thank you very much. Thank you, Mr. Smith. Mr. Ryan has two and a half minutes of rebuttal time. Thank you, Your Honor. Very quickly, hopefully, on the substantially uninterrupted power flow point, they are mischaracterizing our argument. Our argument was not tied to the load. Our argument was always that the language that they pointed to, the language about two different complementary duty cycles, did not tell you whether there's power flowing in the secondary winding circuit. And by the way, Vicor admits as much in its brief, because it points to the same language in Syncor's patents. And this is what Syncor's patent says about power flow. It says, since during normal operation, the isolation stage is operated at a fixed duty cycle in which power is always flowing from input to output, except during the brief switch transitions. So that's a statement that there is not a continuous power flow. In Syncor's patents, there were interruptions in the power flow during the brief switch transitions. They were brief because Syncor designed them to be brief. But how brief are they in Steigerwald? Steigerwald doesn't tell you. So what we know is that this cross-coupling language does not tell you there's continuous power flow. We know there are only… Substantially continuous? No, you don't know that. I mean, the way that Syncor designed its converters, it was substantially uninterrupted. But Steigerwald doesn't tell you how long the interruptions are at all. It doesn't even indicate it had an incentive to make them substantially uninterrupted. And nor would there be such an incentive when you're dealing with pulse loads. And so there's a failure of proof on the issue of whether there's substantially uninterrupted power flow. And the Syncor patent itself makes that clear. So that's why the board went to this average current thing, which even Vicor doesn't attempt to defend. And that's the problem with the board's analysis. It's flawed. It needs to be reversed. Now let me get to secondary considerations. I think it's fair to say that nexus is not binary. There can be a close nexus. There can be a distant nexus. If there are supersets… Can I just ask you to talk to me about figures 10E and 10F of Steigerwald 539? Yes. I think of them as figure 7, 8, and 9. And in figure 7 and 8, there clearly are substantial interruptions when the syncorats are turned on and off. And in figure 9, the evidence was that that circuit… Well, I'm not sure we're on the same page, but that's what I'm looking at. Yes. They make an argument, right? They make an argument that if you line those up properly, that is, in fact, showing some… …substantially uninterrupted. And they're pointed to 10F. And for that, the evidence was that that circuit won't work. Vicor said, well, it will work because if you have leakage inductance, it will work. But Vicor didn't attempt to explain how much leakage inductance you would need in order to make it work. And the specification of Steigerwald says that leakage inductance should be kept to a minimum because inductance is a negative. And so the evidence before the board was that that wouldn't work. The board did not reach that issue. And so it would be improper for this court to conclude that 10F shows substantially uninterrupted power flow when the board didn't make that finding. And there was disputed evidence as to whether that works at all. Do you want to make a brief comment on secondary considerations? I would, Your Honor. On nexus, if you have a superset, to take a mathematical example that's very broad, you might say that there's a nexus, but the nexus is weak. If you have a more precise claim, such as the claims at issue here, that are carefully tailored to the commercially successful products in the field, and the products that were copied, and the products that were the subject of praise, you would say that the nexus is very close. And that's what the board was asked in this proceeding. Is there a nexus? The board found, as a matter of fact, and Vicor concludes it's a factual issue, that there was a nexus. And there was no show that the secondary considerations were the result of Steigerwald or any other prior art. The board addressed that issue. It found a nexus. It found that the secondary considerations in this case, in the 021, was persuasive. In the 702, it called it extremely compelling. In the 290, it also found it relevant. In every one of these board proceedings, the board found there was a nexus, and that the secondary considerations were indeed tied to that nexus. There's no basis to overturn that just because some anticipated claim was anticipated. Our arguments were not directed at those anticipated claims. Thank you, counsel. We will take the case under advisement. Thank you.